# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# SOUTH BEND DIVISION

| | | |
|---|---|---|
| THE W. EARL GAERTE IRREVOCABLE TRUST, *Joseph E. Gaerte, Trustee,* | ) ) ) ) | |
| Plaintiff, | ) | |
| vs. | ) | 3:13-cv-898 PPS |
| NATIONAL LIFE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

In 1995, The W. Earl Gaerte Irrevocable Trust obtained a life insurance policy on the life of Mr. Gaerte. The cash value of the policy grew steadily over time, and by 2010 it exceeded $400,000. It was that year that the Trust signed a second agreement with the insurer, Defendant National Life Insurance Company, which would allow the Trust to stop paying premiums on the life insurance policy in return for accepting a lower cash payout for the policy. The parties call this a "Paid Up Insurance Agreement." But there was a hitch; isn't there always? It seems that the Trust in 2006 had assigned the policy to a bank as collateral for a loan, and no one told the bank that the value of the policy was being reduced to an amount less than what the Trust owed the bank. So after Mr. Gaerte passed away, the bank came knocking for the full amount of what it was owed on its loan, and for whatever reason, National Life paid that full amount to the bank. Since what was owed and paid to the bank exceeded the value of the loan, there was nothing left for the Trust.

The Trust then sued National Life for breach of contract, claiming that the fact that National Life paid *more* to the bank than the policy was worth proves that the policy was worth more than the "paid-up" amount agreed to by the Trust and National Life. Therefore, according to the Trust, it is entitled to the full amount of the policy (minus what was paid to the bank).

The parties have filed cross motions for summary judgment. In essence, the Trust claims that (1) the paid-up agreement was invalid from the get-go because the bank never signed it, as required; and (2) National Life is estopped from claiming the policy was worth only the paid-up amount when it paid more than that to the bank. (DE 17) National Life's principle argument is that the Trust is estopped from claiming that the paid-up agreement is invalid because it behaved as though the agreement was in effect, most tellingly by stopping its premium payments for almost a year before Mr. Gaerte passed away. (DE 19) For the reasons discussed below, I agree with National Life's position and will therefore **GRANT** its motion for summary judgment (DE 19) and **DENY** the Trust's motion (DE 17).

**Background**

The parties agree on the events leading up to this lawsuit. Here's what happened: in 1995, Earl Gaerte purchased a life insurance policy from National Life with a face value of $750,000, appointing his namesake trust as its beneficiary. In 2006, Gaerte's business needed a loan, so the Trust assigned the policy to 1st Source Bank as collateral for a loan of approximately $500,000. In 2010, the Trust's insurance advisor

2

requested to convert the policy to a reduced paid up policy. Essentially this means that the Trust was agreeing to reduce Mr. Gaerte's death benefit in exchange for stopping its premium payments. So instead of receiving $750,000 upon Mr. Gaerte's death, the Trust would receive whatever the policy was worth at the time that the premium payments stopped. In other words, the Trust elected to stop paying any more money into the policy and would instead, upon Mr. Gaerte's death, take whatever it had paid into the policy before executing the paid-up agreement.

Upon the insurance advisor's request, National Life sent the forms to the Trust that were needed to convert the policy to paid-up. In February 2011, Joseph Gaerte, as Trustee of the Trust, executed the Request for Paid Up Insurance with National Life. (For ease of reference I will call this the "agreement.") The form also included a place for the Assignee (here, the Bank) to sign and stated that "[t]his form must be signed by the owner and agent, as well as assignee and irrevocable beneficiary, when applicable." (DE 23-2) The Bank never signed the form and no evidence in the record indicates that it was ever informed about this agreement. At that time, the total paid-up value of the policy was around $400,000. The Trust had stopped making its premium payments on October 30, 2010 and so the paid-up agreement became retroactively effective as of November 10, 2010.

Mr. Gaerte passed away in August 2011. In February 2012, National Life paid approximately $500,000 to the Bank to satisfy the assignment even though the value of the policy was much less than that amount. The Trust received nothing since the

amount of proceeds available from the policy was less than the amount the Trust owed to the Bank.

In August 2013, the Trust filed suit against National Life for breach of contract. As noted, the parties have now filed cross-motions for summary judgment. The Trust claims that the paid-up agreement is invalid because it was never signed by the Bank. It also claims that National Life should be estopped from claiming that the policy was worth only about $400,000 at the time of Mr. Gaerte's death since it paid about $500,000 to the Bank. The Trust therefore seeks the approximately $250,000 it alleges remains on the policy (assuming its original value of $750,000). National Life, on the other hand, claims the Trust should be estopped from challenging the validity of the paid-up agreement because it stopped making its premium payments, as allowed under the agreement, and therefore already reaped the benefit of its bargain. According to National Life, anything else would be a windfall.

**Discussion**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As the parties agree, there is no dispute here about what happened. Instead, this dispute centers on

4

the legal implications of what happened.  In other words, there is no issue of material fact, making this dispute well-suited for summary judgment.

*Validity of the Paid-Up Agreement*

Indiana courts interpret insurance policies in the same way as any other contract. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985).  The components of a valid contract are "offer, acceptance, consideration, and a meeting of the minds of the contracting parties."  *Conwell v. Gray Loon Outdoor Mktg. Group, Inc.*, 906 N.E.2d 805, 812-13 (Ind. 2009).  The parties do not dispute the first three components – offer, acceptance, and consideration – are present in the paid-up agreement.  Where the parties disagree is whether there was a meeting of the minds as to what conditions, if any, had to be satisfied prior to the paid-up agreement taking effect.

The Trust claims that it believed that the paid-up agreement would not go into effect until the Bank signed off on the agreement.   National Life counters that the Trust must have understood that the agreement went into effect once it executed the agreement because the Trust stopped making its premium payments at that time and never resumed.  National Life has the better of the argument.

First, what the Trust did or did not believe when executing the paid-up agreement isn't relevant unless the agreement is ambiguous.   "When the contract terms are clear and unambiguous, the terms are conclusive and we do not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions." *Fackler v. Powell*, 891 N.E.2d 1091, 1096 (Ind. Ct. App. 2008).  And "[a] contract is

ambiguous if a reasonable person would find the contract subject to more than one interpretation; however, the terms of a contract are not ambiguous merely because the parties disagree as to their interpretation." *Id*.

Here, the agreement is unambiguous. The face of the agreement states that William Gaerte's life insurance policy will continue paid up as of November 10, 2010 in the amount of $234,745.00 with dividends of $191,754.00. (DE 23-2.) A paid up policy is a "policy that remains in effect after premiums are no longer due." *Black's Law Dictionary*, Seventh Ed. 1999. Therefore, the amount designated in the agreement becomes the amount of the policy. There is nothing ambiguous about this. So there is no reason to consider any extrinsic evidence, such as the Trust's belief at the time it signed the agreement.

But even if I did consider such evidence, I'm not persuaded that the Trust was in fact under any misunderstanding. The Trust tells me that it believed that the agreement was contingent on getting the Bank's signature. To which I ask, why then did the Trust stop making its premium payments as of November 10, 2010? And why didn't it wait until the Bank signed off before stopping its payments? The Trust plainly understood that the agreement had gone into effect because it stopped and then never resumed its premium payments. And besides, there is no evidence that the Trust was confused. The only evidence before me — that the Trust requested the agreement, executed the agreement, and then behaved in a manner consistent with the agreement — is flatly to the contrary.

6

The Trust further argues that the agreement cannot be valid without the Bank's signature. This argument gives me more pause. Indeed, the Trust correctly points out that the agreement states "This form must be signed by the owner and agent, as well as assignee and irrevocable beneficiary, when applicable." (DE 23-2.) Granted, the agreement doesn't say what happens if the agreement isn't signed by an applicable assignee (*e.g.* if the agreement will be voided or some other action will be taken), but obviously the agreement was supposed to be signed by the Bank. That didn't happen, however, and the parties proceeded as if the agreement was in effect.

The Trust provides me no authority supporting its view that the missing signature should void a contract that, as here, has already been performed. And the closest authority I can find supports the opposing view. For example, in *In re: Vic Supply Co.*, the Seventh Circuit found that contract acceptance can be effectuated by performance even in the absence of a required signature. 227 F.3d 928, 932 (7th Cir. 2000). In that case, a security agreement between a bank and supply company stated that "the terms and provisions of this agreement shall not become effective and the Bank shall have no duties hereunder unless and until this agreement is accepted by Bank as provided below" and the bank never signed the signature line that was provided below. *Id.* at 930. The parties, however, acted as if the agreement was in effect (*e.g.* the bank lent the supply company the money agreed to) and in fact, the bank never asserted that the contract was void. *Id.* Instead, a third party, whose security agreement was held to be secondary to the bank's agreement when the supply company

7

filed for bankruptcy, sued claiming that the agreement was void because the bank never signed it. *Id*. The court denied the third-party's claim because it suffered no harm from the alleged defect in the agreement, and further found that the security agreement was valid because (1) the requirement that the bank sign was intended solely for the bank's protection and conferred no right to the supply company and (2) the parties acted as if the contract was in effect. In other words, "[a]cceptance can be effectuated by performance as well as by a signature." *Id*. at 932 *citing Restatement (Second) of Contracts* § 30(2) (1981).

This case is analogous for a couple of reasons. First, the requirement that the Bank sign the agreement was really for the protection of the Bank — to ensure that it knew that the value of its collateral was being reduced and could then make whatever other arrangements with the Trust that it needed to make. As in *In re Vic Supply*, that protection doesn't afford any right *to the Trust*, nor does it impact the relationship between the Trust and National Life. And to the extent that the Bank's signature was for the protection of the Trust (*e.g.* to prevent the Bank from suing the Trust for the additional money owed), National Life prevented any harm that could have come to the Trust by paying off the Bank in full. Second, the parties here acted as if the contract was in effect after the Trust executed the agreement insofar as the Trust stopped making its premium payments and National Life never sought those payments. Under *In re Vic Supply*, that would be enough to cure whatever deficiency, if any, resulted from not

obtaining the Bank's signature. In other words, the Trust accepted the agreement as valid by acting in accordance with it.

More to the point, there is simply no harm here to the Trust. The Trust got exactly what it bargained for in signing the agreement — it stopped paying its premiums in exchange for accepting a lower payout. Now the Trust wants to have its cake and eat it still. It wants the full value of the policy without having to pay for it. Things don't work that way. Suppose the Bank had signed the agreement and accepted the lower value (which is unlikely without also requiring some way for the Trust to make up the monetary difference). Under this scenario the Trust still would not have gotten anything; all of the proceeds would have gone to the Bank. So there is simply no harm to the Trust for the Bank's not having signed the Agreement.

Thus, I find that the agreement is valid. To the extent that the Bank was a necessary signatory — and I'm not convinced that it was given that the Trust has provided no authority to support that a contract must be held invalid in this circumstance — any deficiency was cured by the parties' subsequent behavior. And more importantly, both parties performed faithfully to the contract and got what they bargained for.

*Estoppel*

What seems to be really driving this lawsuit is the fact that National Life paid more than the paid-up value of Gaerte's life insurance policy to the Bank. The Trust claims that this over-payment should prevent National Life from claiming that the

9

policy was worth only the paid-up amount. Under the Trust's theory, National Life claimed that the policy was worth about $400,000 (including dividends) once it was paid-up, but then turned around and paid the Bank the full $500,000+ it was owed by virtue of the assignment. In the Trust's eyes, this is somehow an admission of the fact that the policy is worth more than $400,000 and therefore the paid up agreement must be invalid and the Trust should be entitled to the full value of the policy – somewhere north of $750,000. This is far-fetched. A much more likely scenario is that National Life paid the bank in full to avoid litigation swallowing more than $100,000 loss in the process.

The Trust nonetheless argues that National Life should be estopped from claiming that the policy is worth only about $400,000 when it paid $500,000 to the Bank. But such a holding would make a mockery out of the doctrine of estoppel. Estoppel is an equitable judicial doctrine whereby "one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct." *Brown v. Branch*, 758 N.E.2d 48, 52 (Ind. 2001). In other words, parties shouldn't be allowed to behave one way to get the other party to do something, and then change course in a way that harms the other party. Here, not only has National Life's payment to the Bank not harmed the Trust (*i.e.* it never would have received a payout anyway), it has actually *benefitted* the Trust by both insulating it from a suit by the Bank and saving it over $100,000. And moreover, the Trust never paid for the full value of the policy — it stopped making its premium payments almost a year before

10

Mr. Gaerte passed away. Therefore, giving the Trust the full amount would be granting it an even larger windfall than it's already received.

It is for this reason that if anyone should be estopped from challenging the existence of the agreement, it is the Trust. Recall that it was the Trust that requested and signed the agreement, and it was the Trust that stopped paying its premium payments. National Life relied on this conduct in not seeking the premium payments it would otherwise have been owed. All parties acted in accordance with the agreement. And whatever payment National Life later made to the Bank had no bearing on the Trust and National Life's agreement, as discussed above, other than that it probably insulated one or both of the parties from a lawsuit by the Bank. The Trust is therefore estopped from pursuing its claims and I will grant National Life's motion for summary judgment.

**Conclusion**

At bottom, the Bank should have signed the agreement. That was an oversight by one or both of the parties. But whatever harm could have resulted from that oversight was prevented by National Life paying off the Bank in full. That act prevented any potential claim the Bank may have had against either National Life or the Trust for the excess funds owed to the Bank. Had the Bank signed, the Trust would have had the benefit of stopping its premium payment, plus protection from any claim by the Bank, but it probably would have had to have made some arrangements to pay the approximately $100,000 additionally owed after the policy's value was reduced. As

11

it turned out, the Trust got the benefit of stopping its premium payments, plus protection from any claim by the Bank, *and* the extra $100,000 paid by National Life. It's hard to see how the Trust suffered any harm at all. Indeed, the Trust received a windfall. For the reasons discussed above, I will therefore **GRANT** National Life's motion for summary judgment (DE 19) and **DENY** the Trust's motion (DE 17). The Clerk is directed to enter judgment in favor of National Life.

**SO ORDERED**.

ENTERED: June 5, 2015

s/Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
